## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASKAR AITELIYEV,** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-3852 (CRC) |
| **ALEJANDRO MAYORKAS,** *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs in this case are 20 noncitizens who sought to qualify for employment-based U.S. visas available through the EB-5 Regional Center Program by investing substantial sums in an equestrian center nestled in the Appalachian foothills.  After putting up the required capital, Plaintiffs petitioned the United States Citizenship and Immigration Services ("USCIS") for their visas.  Years later, they still have not heard back.  Plaintiffs therefore filed this suit to compel the agency to act, raising three challenges to their processing delays.  First, they contend that USCIS acted arbitrarily when it revoked the "blanket expedite" that previously covered all petitions from the equestrian center.  Second, they assert that their petitions should be pushed to the top of the queue because the EB-5 Reform and Integrity Act of 2022 mandates that USCIS "prioritize the processing and adjudication of petitions for rural areas."  8 U.S.C. § 1153(b)(5)(E)(ii)(I).  Third, regardless of whether they should cut the line via either of these two routes, Plaintiffs maintain that the delay in processing their petitions is unreasonable.  The government moves to dismiss the amended complaint in full.

The Court will grant the motion in part.  Plaintiffs' first claim stumbles out the gate because decisions to expedite visas are committed to USCIS's discretion and thus unreviewable. The third claim over the reasonableness of the delay in processing their petitions also fails for

many of the reasons the D.C. Circuit provided when rejecting a similar challenge in <u>Da Costa v.</u>
<u>Immigration Investment Program Office</u>, 80 F.4th 330 (D.C. Cir. 2023).  Accordingly, the Court
will dismiss both of these counts.  As to Plaintiffs' second contention that USCIS must prioritize
rural petitions under the EB-5 Reform and Integrity Act of 2022, the government has not carried
its burden of proving that the prioritization provision is nonretroactive and thus does not apply to
petitions, like Plaintiffs', that were filed prior to the Reform Act.  The Court will therefore deny
the motion to dismiss with respect to this charge for the moment but invite the government to
further develop this argument in a renewed motion to dismiss the remaining count.

**I.    Background**

    A.  <u>Legal Background</u>

       *1.  EB-5 Visas and the Regional Center Program*

In 1990, Congress amended the Immigration and Nationality Act ("INA"), 8 U.S.C.
§ 1101 <u>et seq.</u>, to establish an employment-based visa program for immigrants who help create
jobs for American workers.  <u>See</u> Immigration Act of 1990, Pub. L. No. 101-649, § 121(b)(5),
104 Stat. 4978, 4989 (codified at 8 U.S.C. § 1153(b)(5)).  These so-called "EB-5 visas" are
available to applicants who make a significant capital investment in a new commercial enterprise
that "will benefit the United States economy by creating full-time employment for not fewer than
[ten] United States citizens, United States nationals," or certain other residents.  8 U.S.C.
§ 1153(b)(5)(A)(ii).

Two years later, Congress created an additional path to qualify for an EB-5 visa through
what is now known as the Regional Center Program.  <u>See</u> Departments of Commerce, Justice,
and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-395,
§ 610, 106 Stat. 1828, 1874–75 (1992).  Under the Regional Center Program, EB-5 petitioners

are permitted to "pool[] their investments with [one] or more qualified immigrants" into "a regional center in the United States, which has been designated by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth, including prospective job creation and increased domestic capital investment."  8 U.S.C. § 1153(b)(5)(E)(i). Petitioners who invest in an approved regional center program can meet the statutory job-creation requirement not only by tallying all jobs directly created by their enterprise but also based on economic projections of direct and indirect job creation.  See 8 C.F.R. § 204.6(m)(3).

Although the Regional Center Program has become an integral part of the EB-5 system over the years, it has never enjoyed permanent authorization.  Originally designed as a five-year pilot initiative, Congress has periodically reauthorized the program for limited time periods.  See, e.g., Visa Waiver Permanent Program Act, Pub. L. No. 106-396, § 402(a), 114 Stat. 1637, 1647 (2000) (extending the program ten years).  Congress recently reupped the program in 2020 for one more year, see Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Div. O., § 104, 134 Stat. 1182, 2148 (2020), but failed to act again before that period expired, causing a statutory lapse starting in June 2021.  During the next seven months, USCIS froze the processing of all Regional Center Program petitions until Congress reimplemented the program in March 2022 with the EB-5 Reform and Integrity Act of 2022 ( "Reform Act"), Pub. L. No. 117-103, Div. BB, § 103, 136 Stat. 1070, 1075 (2022).

The Reform Act did more than simply renew the Regional Center Program; it revamped the program in many respects.  Motivated by a concern that some of the regional centers engaged in fraud and posed national security concerns, the Reform Act created a new statutory section, 8 U.S.C. § 1153(b)(5)(E), spelling out updated criteria for regional centers.  However, the Reform Act specified that these substantive amendments to the qualifying criteria were prospective and

that USCIS should process pending petitions filed before the Act according to the previous rules. Id. § 1154(a)(1)(H)(i).  The Reform Act also introduced two changes to the EB-5 program that are relevant here.  First, it rejiggered the EB-5 visa set-aside rules.  The INA previously reserved 3,000 of the nearly 10,000 EB-5 visas available each year for petitioners who had invested in "rural" or "high unemployment" areas.  See id. §§ 1153(b)(5)(A), (b)(5)(B) (2012).  The Reform Act transformed this set-aside into a percentage-based allocation with 20% devoted to those who invest in rural areas, 10% allocated for those who invest in high-unemployment areas, and 2% for those who invest in infrastructure projects.  Id. § 1153(b)(5)(B)(i)(I) (2024).  Second, in addition to allocating one-fifth of EB-5 visas to rural investments, the Reform Act also directed USCIS to "prioritize the processing and adjudication of petitions for rural areas."  8 U.S.C. § 1153(b)(5)(E)(ii)(I).  This new prioritization rule was a boon for those who invest in rural areas given the labyrinthine nature of the EB-5 application process.

### 2. Application Process

The EB-5 application process begins when an individual files a petition, called a Form I-526, with USCIS for classification as an approved investor.  8 C.F.R. § 204.6.  If approved, petitioners living in the United States can apply for two-year conditional lawful permanent resident status via a Form I-485, see 8 U.S.C. § 1186b(a)(1); 8 C.F.R. §§ 216.1, 245.2, while those residing outside the country can do so via a system called "consular processing," see 8 U.S.C. §§ 1186b(a)(1), 1201–02; 8 C.F.R. § 216.1; 22 C.F.R. §§ 42.32(e), 42.41–42.  After two years, the petitioner can seek to remove the conditions placed on her residency by filing a Form I-829.  See 8 C.F.R. § 216.6(a)(1)(i).  Approval of the Form I-526 is thus the first of several steps toward achieving full residency status—but even that first step can be a maze unto itself.

The INA caps the total number of employment-based visas the government may grant annually and then limits the number of visas for specific categories of employment-based visas. 8 U.S.C. §§ 1151, 1153(b).  EB-5 visas "shall be made available, in a number not to exceed 7.1 percent of" the total number of employment-based visas.  Id. § 1153(b)(5)(A).  As noted above, this amounts to around 10,000 EB-5 visas per year.  These visas are further subject to the INA's per-country caps, which limit the annual issuance of visas to individuals from certain countries. For "family-sponsored and employment-based immigrants, . . . the total number of immigrant visas made available to natives of any single foreign state . . . may not exceed 7 percent" of the total number of family-sponsored and employment-based visas made available in that fiscal year. See id. § 1152(a)(2).  These parameters shape how USCIS processes Form I-526 petitions.

For years, the agency had followed a simple "first-in, first-out" priority rule.  See Meina Xie v. Kerry, 780 F.3d 405, 406 (D.C. Cir. 2015).  That changed in January 2020 when USCIS announced that it would now "give[] priority to petitions where visas are immediately available" under the per-country cap.  USCIS, USCIS Adjusts Process for Managing EB-5 Visa Petition Inventory (Jan. 29, 2020), https://perma.cc/DUG5-ARPL.  Under the new "visa availability" approach, USCIS prioritizes "petitions where visas are immediately available, or soon available," thereby permitting applicants "from countries where visas are immediately available . . . to use their annual per-country allocation of EB-5 visas" and avoiding bottlenecks caused by processing I-526 petitions from oversubscribed countries that have hit their visa limits.  Id.; see also Da Costa, 80 F.4th at 337 ("USCIS continues to sequence adjudications according to the first-in, first-out principle, with the caveat that it first processes petitions for investors for whom a visa is either now or soon will be available.") (quotation marks omitted).  USCIS further maximizes efficiency within the group of I-526 petitions for which visas are available or soon to be

available by giving extra preference to petitions where USCIS has already reviewed the commercial enterprise.  See Mot. Dismiss at 6.

Summing up this visa-availability approach, USCIS has explained that it organizes I-526 petitions into three queues: (1) "[t]he first queue contains Form I-526 petitions where a visa is not yet available or soon to be available and is ordered first-in, first-out"; (2) "[t]he second queue contains petitions related to projects . . . not previously reviewed and have a visa immediately available or soon to be available" and "is organized by the filing date of the oldest pending petition associated with [a] project in that queue"; and (3) "[t]he third queue contains I-526 petitions that have an available (or soon to be available) visa and either a reviewed project or 'non-pooled' (single investor) standalone project.  This queue is organized by receipt date of the I-526 petition (from oldest to newest)" and "[p]etitions are generally assigned to officers in first-in, first-out order."  USCIS, EB-5 National Stakeholder Engagement, at 11 (Oct. 19, 2022), https://perma.cc/X7Y8-HUTL.

In July 2023, USCIS again altered its processing rules within the third queue when announcing that, henceforth, it would group petitions from previously reviewed projects that were filed on or before November 30, 2019.  See USCIS, Update to Visa Availability Approach for Form I-526 (July 18, 2023), https://perma.cc/VV7U-W9HG.  These grouped petitions are sorted from oldest to newest based on the date of the earliest filed petition for each project.  Id. USCIS justified this latest update in a press release, explaining:  "Given the large volume of petitions filed shortly before the EB-5 modernization rule had taken effect in November 2019 and because the project documents are often the same, assigning multiple petitions associated with the same [project] to the same adjudicator(s) will enable [them] to gain greater processing efficiencies, reduce the backlog and Form I-526 completion times, and support consistency and

accuracy in adjudications, while maintaining fairness given the closeness in the filing dates of these petitions."  Id.

B.  Factual & Procedural Background

Plaintiffs are 20 noncitizens from Brazil, Canada, France, Germany, India, Kazakhstan, Pakistan, Russia, Venezuela, and the United Kingdom.  Am. Compl. ¶¶ 10–31.[1]  Each filed his or her I-526 petition with USCIS between February 2019 and June 2021 after investing in Odlum Equestrian Lenders, LLC, a new commercial enterprise sponsored by the Appalachian EB-5 regional center, which sponsors the Tryon International Equestrian Center and Resort ("Tryon Center") located in the Blue Ridge Foothills of Mill Spring, North Carolina.  Id. ¶¶ 7, 10–31, 60.

The Tryon Center has been a hotbed for EB-5 investments.  To attract investors, Plaintiffs allege that the Tryon Center requested and received a "blanket expedite" of all petitions stemming from the enterprise starting in April 2017.  Id. ¶¶ 61–62, 77, 85.  Due to this expedited processing, many Tryon Center investors were placed at the front of the line and had their Form I-526 petitions adjudicated within a matter of months.  But after learning that a competitor had been informing prospective investors that USCIS had revoked the Tryon Center's expedite, Plaintiffs allegedly contacted the agency and were informed that the blanket expedite request was initially approved in connection with the 2018 World Equestrian Games and that any priority treatment that occurred after the Game's completion was "in error."  Id. ¶¶ 89–92.

Plaintiffs are therefore an unfortunate few who were not processed before Tryon's expedited processing was revoked and are still awaiting word on their petitions.  Id. ¶ 38. Frustrated with the years-long delay, they filed suit in late 2022, alleging violations of the

---

[1]  There were originally 21 Plaintiffs, but Plaintiff Mridhul Prakash voluntarily dismissed his case after USCIS adjudicated his petition.  See Notice of Voluntary Dismissal, ECF No. 16.

Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., and seeking both mandamus and APA relief, see Am. Compl. ¶¶ 282–305.  Their amended complaint raises three distinct arguments for why such relief is warranted: (1) USCIS's revocation of Tryon's blanket expedite was arbitrary and capricious; (2) regardless of whether USCIS acted arbitrarily when reneging on the expedite, it was statutorily required to push Plaintiffs' petitions to the top of the pile because they stem from investments in rural areas and thus receive priority processing under the Reform Act; and (3) even if Plaintiffs' petitions do not warrant any form of special treatment, the lengthy delay in processing them is nonetheless unreasonable.

USCIS responded by filing a motion to dismiss the amended complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim on which relief can be granted.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 12(b)(1), plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged."  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation marks omitted).  The Court also may examine materials outside the pleadings as it deems appropriate to resolve the question of its jurisdiction. See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Rule 12(b)(6) requires the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  In analyzing a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The Court must "accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs" but need not "accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations."  Owens v. BNP Paribas, S.A., 897 F.3d 266, 272 (D.C. Cir. 2018). In addition to the allegations within the four corners of the complaint, the Court may consider "documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006).

## III.  Analysis

Taking the claims in turn, the Court first concludes that it lacks jurisdiction to second guess USCIS's revocation of the expedite for Tryon Center petitions because such decisions are committed to the agency's discretion.  By contrast, Plaintiffs' contention that USCIS is nonetheless obligated to prioritize their "rural" petitions under the Reform Act is a pure question of statutory interpretation well within the Court's wheelhouse.  At the present juncture, however, the Court is uncertain whether the Reform Act's priority-processing rule should be given retroactive effect to petitions pending before the Reform Act took effect because the government does not plumb the relevant statutory text or background retroactivity rules in its motion to dismiss.  The Court will therefore deny the motion as to this claim while inviting the government to develop its argument further in a subsequent motion to dismiss. Finally, assuming for present purposes that Plaintiffs are not entitled to priority processing, the Court finds that the delay—while undoubtedly frustrating—is not unreasonable under binding precedent.

A.  Expedite Revocation

Plaintiffs first challenge USCIS's revocation of the prior expedite for all Tryon Center petitions.  In their view, the agency's explanation that the blanket expedite was intended for the 2018 World Equestrian Games and that any subsequent expedites were "in error" is implausible given that USCIS expedited hundreds of Tryon Center petitions after the Games concluded.  See Am. Compl. ¶ 105.  They further claim that internal agency communications obtained via the Freedom of Information Act ("FOIA") refute the official account and prove that, in truth, USCIS decided to revoke the expedite in 2021 or 2022.  See Opp'n at 9–12.  Gesturing toward possible foul play, Plaintiffs allege that USCIS discussed pulling the plug on the Tryon Center expedite with a rival equestrian center before publicizing the decision.  See id. at 11.  They accordingly contend that this unexplained (and possibly illegitimate) revocation decision was arbitrary and capricious, in violation of the APA.  See 5 U.S.C. § 706(2)(A).

No matter these allegations' merits, the Court lacks jurisdiction to consider them.  While courts normally can review final agency actions under the APA, there is an exception to that general rule:  Courts cannot review actions that are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  An action is committed to agency discretion if a statute provides "no meaningful standard against which to judge the agency's exercise of discretion."  Heckler v. Chaney, 470 U.S. 821, 830 (1985).  In deciding whether that is the case, courts consider the "nature of the administrative action at issue and the language and structure of the statute."  Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 156 (D.C. Cir. 2006).

After conducting this inquiry when confronted with a similar claim, another court within this District concluded that "the decision to expedite a petition—or not—is committed to the Government's discretion."  Mukkavilli v. Jaddou, No. 22-cv-2289 (TNM), 2023 WL 4029344, at

*11 (D.D.C. June 15, 2023).  The court in <u>Mukkavilli</u> noted that the Reform Act provides that the agency "may process petitions in a manner and order" it establishes, <u>see</u> Pub. L. 117-103, § 103(b)(1), 136 Stat. 1070, 1075 (2022) (codified at 8 U.S.C. § 1153(b)(5)(E)(ii)), and that its predecessor explicitly stated that USCIS "may give priority to petitions filed by aliens seeking admission," Pub. L. No. 102-395, § 610(d) (Oct. 6, 1992), as amended by Pub. L. 108-156 (Dec. 3, 2003) (repealed Mar. 15, 2022).  <u>Id.</u>  The "usual presumption is that 'may' confers discretion," <u>Zhu v. Gonzalez</u>, 411 F.3d 292, 296 (D.C. Cir. 2005) (cleaned up), and "imposes no constraints on [an agency's] judgment," <u>Citizens for Responsibility & Ethics in Wash. v. FEC</u>, 892 F.3d 434, 439 (D.C. Cir. 2018).  <u>Mukkavilli</u> also observed that the USCIS website confirms this understanding when explaining that the "decision to accommodate an expedite request is within [its] sole discretion."  2023 WL 4029344, at *11 (quoting <u>Requests to Expedite Applications or Petitions</u>, USCIS Policy Manual, Vol. 1, Part A, Ch. 5, https://perma.cc/W4BW-B5ZE).

The Court sees no reason to deviate from this well-supported conclusion, and Plaintiffs certainly have not advanced one.  To the contrary, Plaintiffs "do not dispute that granting an expedite is a matter committed to Defendants' discretion."  Opp'n at 7.

They nevertheless urge the Court to meddle in this matter of discretion for two reasons. Neither is persuasive.  Plaintiffs first contend that under <u>FCC v. Fox Television Stations, Inc.</u>, an agency is required to provide a reasoned explanation for reversing course or changing policy. <u>See</u> 556 U.S. 502, 516–17 (2009).  Yet <u>Fox Television</u>, and the other cases on which Plaintiffs rely, did not address a matter committed to an agency's discretion, and the APA makes clear that the ordinary § 706(2)(A) standard of review does not apply in such cases.  <u>See</u> 5 U.S.C. § 701(a) ("This chapter [including 5 U.S.C. § 706(2)(A)] applies . . . except to the extent that . . . agency action is committed to agency discretion by law.").  Plaintiffs next submit that they invested in

the Tryon Center on the assumption that the expedite would remain in place and fault the agency for not taking their reliance interests into account. Opp'n at 12. Putting to the side the dubious premise that it can be reasonable to rely on an expedite decision that, by law, could be revoked at any moment, reliance alone does not wipe away the APA's statutory limits or confer jurisdiction where none exists. Without the power to review USCIS's expedite decisions, the Court must dismiss this claim.

　　B.  Prioritization of Rural Petitions

　　Plaintiffs' next argument for why they should be bumped to the front of the queue has more legs. The Reform Act mandates that USCIS "prioritize the processing and adjudication of petitions for rural areas." 8 U.S.C. § 1153(b)(5)(E)(ii)(I). Plaintiffs contend that under this new provision, which went into effect in March 2022, all pending petitions from the Tryon Center should be given preference. The merits of this argument turn on whether § 1153(b)(5)(E)(ii)(I) applies retroactively to rural petitions filed before the Reform Act's passage. Unfortunately, the government does not fully explore this issue in its briefing. The Court will therefore deny the motion to dismiss this claim and provide the parties another opportunity to ventilate the issue further. But to set the stage for this next act, the Court offers its current view of the matter.

　　Although it is often said that there is a presumption against retroactivity, the Supreme Court has recognized that, outside the criminal context, "the antiretroactivity presumption is just that—a presumption, rather than a constitutional command." Republic of Austria v. Altmann, 541 U.S. 677, 692–93 (2004). Deciding whether the presumption holds is therefore a matter of statutory interpretation guided by the three-part test set forth in Landgraf v. USI Film Products, 511 U.S. 244 (1994). First, courts consider "whether Congress has expressly prescribed the statute's proper reach." Id. at 280. If so, the explicit statement controls. If not, courts "must

determine whether the new statute would have retroactive effect." Id.  That might sound like an odd question given that the entire inquiry is to decide whether a statute applies to conduct occurring before it was on the books.  But the Supreme Court used the phrase "retroactive effect" here in a narrow sense of whether extending the law's reach to past conduct would raise the sorts of concerns that a presumption against retroactivity is intended to guard against.  See id. at 269 (noting a "statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment").  In particular, the Supreme Court has instructed lower courts to ask "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. at 280.  "If the statute would operate retroactively" in this sense, "it does not govern absent clear congressional intent favoring such a result." Id.  But not all cases will raise these concerns.  Importantly here, the "presumption against retroactivity will not prevent its application to" *procedural* rights.  Hamdan v. Rumsfeld, 548 U.S. 557, 577 (2006).  When these concerns are absent and the presumption against retroactivity does not apply, courts must resort to "'[n]ormal rules of construction,' including a contextual reading of the statutory language" to ascertain the statute's temporal reach.  Id. (quoting Lindh v. Murphy, 521 U.S. 320, 326 (1997)).

Neither party here applied the Landgraf framework to the question of whether the Reform Act's priority-processing provision applies to rural petitions filed prior to its enactment.  Without a more fulsome treatment by the parties, it would be premature to resolve this issue—especially because, in the Court's view, the question appears to be a close one.  The Court does not identify any express congressional statement on the provision's reach.  Nor does it believe applying the priority-processing rule to petitions filed before 2022 would affect any substantive rights or have the kind of impact that would trigger the antiretroactivity presumption.  The outcome thus turns

on the best interpretation of the relevant provision, which is not clear cut given the statute's conflicting signals.

At the first step, the Court does not discern any clear indication of § 1153(b)(5)(E)(ii)(I)'s proper reach in the Reform Act.  That provision reads:  "In processing petitions under section 1154(a)(1)(H) of this title for classification under this paragraph, the Secretary of Homeland Security . . . shall prioritize the processing and adjudication of petitions for rural areas."  Section 1154(a)(1)(H), in turn, provides that "[a]ny alien seeking classification under section 1153(b)(5) of this title may file a petition for such classification with the Secretary of Homeland Security.  An alien seeking to pool his or her investment with [one] or more additional aliens seeking classification under section 1153(b)(5) of this title shall file for such classification in accordance with section 1153(b)(5)(E) of this title, *or before March 15, 2022*, in accordance with section 1153(b)(5) of this title."  (Emphasis added.)

Plaintiffs contend that the cross-reference to § 1154(a)(1)(H) evinces a clear intent that the priority-processing rule apply to all rural petitions, including those filed before the Reform Act.  See Opp'n at 3–5.  They reason that § 1153(b)(5)(E)(ii)(I) covers all petitions filed under § 1154(a)(1)(H) and that this provision, on its own terms, applies to all petitions regardless of when they were filed.  That is supposedly evidenced in § 1154(a)(1)(H)'s second sentence.  The provision's first sentence pertains to all EB-5 petitions filed under § 1153(b)(5).  The second focuses on the Regional Center Program and specifies that, while such petitions filed after the Reform Act are governed by the revamped standards contained in § 1153(b)(5)(E), pending petitions filed before the Reform Act are assessed by the prior rules.  Section 1154(a)(1)(H) therefore covers all petitions in Plaintiffs' eyes, both pre- and post-Reform Act.  Thus, when directing USCIS to prioritize rural petitions in "processing petitions under section

1154(a)(1)(H)," Plaintiffs contend that § 1153(b)(5)(E)(ii)(I) incorporates § 1154(a)(1)(H)'s

scope and requires prioritization of all rural petitions, no matter when they were filed.

Regardless of the merits of this argument, which the Court takes up below, this complex

analysis of the statutory text in no way amounts to a *clear* indication of the priority-processing

provision's scope.  Cf. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 209 (1988) (noting that

42 U.S.C. § 1395x(v) "*on its face* permits some form of retroactive action" (emphasis added)).

Further analysis is therefore required.

Moving then to the second step, the presumption against retroactivity likely does not have

bite here because applying the priority-processing provision to pre-Reform Act petitions would

not have "a retroactive consequence *in the disfavored sense*."  Fernandez-Vargas v. Gonzales,

548 U.S. 30, 37 (2006) (emphasis added).  As noted above, the antiretroactivity presumption

applies only if applying the law to conduct predating its enactment "would impair rights a party

possessed when he acted, increase a party's liability for past conduct, or impose new duties with

respect to transactions already completed."  Landgraf, 511 U.S. at 280.  That is because, at its

core, the presumption against retroactivity is driven by due process concerns that are implicated

only when "*substantive* rights, liabilities, or duties" are at stake.  Id. at 278 (emphasis added).

Consistent with this view, Landgraf observed that *procedural* rules that "regulate secondary

rather than primary conduct" usually do not "rais[e] concerns about retroactivity."  Id. at 275;

accord Bartko v. SEC, 845 F.3d 1217, 1223 (D.C. Cir. 2017).  Though the procedural/substantive

divide is far from ironclad, see Martin v. Hadix, 527 U.S. 343, 359 (1999), it offers a useful rule

of thumb.

The priority-processing provision does not appear to raise retroactivity concerns.  A rule

governing how USCIS processes petitions is patently procedural, and it is hard to fathom how

such processing rules negatively affect the substantive rights of any party.  USCIS regularly changes its rules for organizing petitions already pending in its queues, and there is no reason to believe that Congress cannot do the same without raising retroactivity concerns.  After all, the D.C. Circuit has held that petitioners have no "substantive right to any particular process for having their applications considered."  Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs., 104 F.3d 1349, 1352 (D.C. Cir. 1997).  Because no substantive right is affected, and the presumption against retroactivity does not apply, the Court must travel down to the third step.

At the third and final step, the inquiry redounds to what is the best interpretation of the statute's reach under ordinary "rules of construction."  Hamdan, 648 U.S. at 577; see Felter v. Salazar, 679 F. Supp. 2d 1, 6 (D.D.C. 2010) (noting that a statute may be retroactive despite the lack of the word "retroactive" or formulaic expressions).  But the standard interpretative rules point in different directions here.

On one side of the ledger is the textual point outlined above:  Section 1153(b)(5)(E)(ii) directs the agency to prioritize rural petitions when "processing petitions under section 1154(a)(1)(H)," and that cross-referenced provision expressly covers future petitions as well as the backlog of petitions pending before USCIS when the Reform Act took effect.  From this vantage, § 1153(b)(5)(E)(ii) would seem to apply to pre- and post-Reform Act petitions alike, just as Plaintiffs contend.  But while this textual argument has appeal, it is far from conclusive.  Section 1153(b)(5)(E)(ii) appears within § 1153(b)(5)(E), the new statutory section specifying the rules for petitions filed under the Regional Center Program.  Section 1154(a)(1)(H) specifies that, in general, the substantive rules in § 1153(b)(5)(E) apply only to petitions filed after the Reform Act.  If Congress sought to establish a new processing rule that applies to both pre- and

post-Reform Act petitions, it picked an odd place to insert that rule.  Cf. Landgraf, 511 U.S. at

245 (noting that plaintiff's "statutory argument would require the Court to assume that Congress

chose a surprisingly indirect route to convey an important and easily expressed message").[2]

On the other side of the equation is a purpose-based argument:  It is questionable that the

Reform Act sought to offer a windfall to those who have already invested in rural projects by

bumping them to the front of the line.  The Reform Act sought to attract *new* capital into rural

areas and, at the same time, root out fraud in the Regional Center Program.  See Leahy Press

Release, Leahy, Grassley Introduce EB-5 Investor Visa Integrity Reform Bill (Mar. 18, 2021),

https://perma.cc/T2UB-T794.  To achieve these twin goals, the Reform Act tightened the rules

governing the Regional Center Program while conferring two new benefits to investors in rural

areas: (1) a rural set-aside of 20% of all EB-5 visas, see 8 U.S.C. § 1153(b)(5)(B)(i)(I)(aa); and

(2) priority processing for rural petitions, see id. § 1153(b)(5)(E)(ii).  These two provisions can

be viewed as working in unison.  New investors—including those from countries, such as China,

that hit their per-country cap and would otherwise be deprioritized under the visa-availability

approach—would be encouraged to pour money into rural areas knowing that these investments

would allow them to jump the line and access the set-aside visas.  But that logic changes if the

priority-processing rule was made retroactive.  Moving up pending petitions from completed

investments (which were governed by laxer pre-Reform Act substantive standards) would, at

---

[2]  The awkwardness of the priority-processing provision's placement is, to a degree,
unavoidable no matter how the retroactivity issue shakes out.  While it appears in a subsection
dedicated to the Regional Center Program, the priority-processing provision applies to *all* EB-5
petitions.  This is evidenced in two ways.  First, the priority-processing provision covers the
"processing [of] petitions under section 1154(a)(1)(H) of this title for classification under this
paragraph."  Section 1154(a)(1)(H) covers all EB-5 petitions.  Second, § 1153(b)(5)(E)(ii) refers
to all petitions "under this paragraph."  The "paragraph" at issue is the entirety of § 1153(b)(5).
Congress therefore, for some unclear reason, placed a new processing rule applying to all EB-5
petitions into a more particular provision addressing the Regional Center Program.

least temporarily, frustrate this purpose by clogging up the fast-past process designed to attract new capital.  Accordingly, the argument runs, Congress could not have intended the priority-processing provision to operate retroactively.

This line of reasoning dovetails with Mukkavilli's conclusion that the other side of this coin, the rural visa set-aside, is *not* retroactive.  In finding the visa set-aside nonretroactive, the court in Mukkavilli remarked that the Reform Act established a new Regional Center Program which reflected a "clean break from the prior regime."  2023 WL 4029344, at *9.  For this point, Mukkavilli looked to one of the provisions at issue here, 8 U.S.C. § 1154(a)(1)(H), which draws a distinction between the pre- and post-Reform Act rules, as well as various other effective dates sprinkled throughout the Reform Act stating that other policies do not take effect until after the Reform Act had become law.  Id.  Mukkavilli then found that "courts have noted that similar effective dates are probative (indeed, sometimes conclusive) evidence of solely prospective application."  Id. at *8 (citing Landgraf, 511 U.S. at 257–58; Lytes v. D.C. Water & Sewer Auth., 572 F.3d 936, 940 (D.C. Cir. 2009)).  Following that logic, the court in Mukkavilli concluded that the rural visa set-aside provision did not apply retroactively.  Id. at *9.  Given that the visa set-aside and the priority-processing provision, in certain respects, operate in tandem, Mukkavilli may suggest that the priority-processing rule is likewise forward-looking.

Yet, as with the textual parsing, this purpose-based argument is not definitive.  Even if the visa set-aside and priority-processing provisions work together and should be read as having the same temporal reach, an assumption that is itself contestable, there are grounds to question Mukkavilli's interpretation of the set-aside's scope.  Though Mukkavilli was correct that the specification of an effective date in the future *may* suggest a law is nonretroactive, this is not a case where the Court can "imagine no reason for the Congress to have delayed the effective date

other than to give fair warning . . . to affected parties and to protect settled expectations." <u>Lytes</u>, 572 F.3d at 940.  It is instead plausible that Congress sought to afford USCIS sufficient time to revise its internal processing systems before requiring the agency to implement new procedural rules.  Additionally, and perhaps more importantly, while <u>Mukkavilli</u> saw a clean break between the pre- and post-Reform Act regimes, it overlooked important points of continuity.  As already described, prior to the Reform Act, the statute devoted 3,000 of the nearly 10,000 EB-5 visas for those who invested in rural or high-unemployment regions—or around 30% of the available EB-5 visas.  8 U.S.C. §§ 1153(b)(5)(A), (b)(5)(B) (2012).  The Reform Act maintains much of that prior regime:  It also reserves around 30% of EB-5 visas to petitioners who have invested in rural or high-unemployment areas, specifying that 20% should be devoted to the former and 10% to the latter.  <u>Id.</u> § 1153(b)(5)(B)(i)(I) (2024).  The definition of "rural area" also remained largely the same.  <u>Compare</u> <u>id.</u> § 1153(b)(5)(B)(iii) (2006), <u>with</u> <u>id.</u> § 1153(b)(5)(D)(vii) (2024).  This relative constancy casts the retrospectivity question in a new light.  Given that pre-Reform Act petitioners who had invested in rural areas were eligible for a share of the general 30% visa set-aside, it would be odd if those same petitioners were ineligible for the more specific 20% rural set-aside now in place.  And if the visa set-aside rule were indeed retroactive, the purpose-based argument that the priority-processing rule applies only prospectively would lose some of its shine.

Taking stock, the <u>Landgraf</u> test suggests that the presumption against retroactivity does not attach and that the answer to whether the priority-processing provision applies to petitions filed prior to the Reform Act turns on the standard rules of construction, which do not clearly resolve the matter because the statute contains competing textual and contextual signals.  The government does not fully decipher these signals in its current briefing.  Rather than decode the

statute in the first instance, the Court will deny the motion on this score and invite the

government to address these competing considerations more fully in a subsequent motion to

dismiss.

    C.  <u>Unreasonable Delay: TRAC Factors</u>

    Finally, even if USCIS is not required to prioritize rural petitions predating the Reform

Act, Plaintiffs contend that its delay in processing their petitions is nonetheless unreasonable.

The Court disagrees.

    The reasonableness of a delay in agency adjudication is judged by the six-factor test set

out in <u>Telecommunications Research & Action Center v. FCC</u>, 750 F.2d 70 (D.C. Cir. 1984)

("<u>TRAC</u>"), which specifies that:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
> (2) where Congress has provided a timetable or other indication of the speed with
> which it expects the agency to proceed in the enabling statute, that statutory scheme
> may supply content for this rule of reason; (3) delays that might be reasonable in
> the sphere of economic regulation are less tolerable when human health and welfare
> are at stake; (4) the court should consider the effect of expediting delayed action on
> agency activities of a higher or competing priority; (5) the court should also take
> into account the nature and extent of the interests prejudiced by delay; and (6) the
> court need not "find any impropriety lurking behind agency lassitude in order to
> hold that agency action is 'unreasonably delayed.'"

<u>In re United Mine Workers of Am. Int'l Union</u>, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting

<u>TRAC</u>, 750 F.2d at 80 (citations omitted)).  Not all six factors are afforded equal weight.  The

D.C. Circuit explained in <u>Da Costa</u> that the "most important" factors "are factor one—whether

the agency's timing of adjudications follows a 'rule of reason'—and factor four—the effect that

an order 'expediting delayed action' would have on 'agency activities of a higher or competing

priority.'"  80 F.4th at 340 (quoting <u>TRAC</u>, 750 F.2d at 80).  Further, under <u>TRAC</u> and its

progeny, the ultimate determination of whether a particular delay is unreasonable is "a fact

intensive inquiry" that may require a substantial evidentiary record.  <u>Nio v. DHS</u>, 270 F. Supp.

3d 49, 66 (D.D.C. 2017).  Nevertheless, the <u>TRAC</u> factors provide a useful framework even on a motion to dismiss.  "In applying these factors, the Court is not determining whether there has been an unreasonable delay; rather, it is determining whether plaintiffs' complaint has alleged facts sufficient to state a plausible claim for unreasonable administrative delay."  <u>Ghadami v. DHS</u>, No. 19-cv-00397 (ABJ), 2020 WL 1308376, at *7 n.6 (D.D.C. Mar. 19, 2020).

Balancing these factors, the Court concludes that Plaintiffs have not carried their burden of plausibly stating an unreasonable-delay claim.  As in <u>Da Costa</u>, the Court begins its analysis with the weightiest considerations—<u>TRAC</u> factors one and four—which are determinative here.

### 1.  *TRAC Factor One*

<u>TRAC</u> factor one asks whether "the time agencies take to make decisions [is] governed by a 'rule of reason.'"  750 F.2d at 80 (citation omitted).  In making this determination, courts evaluate "whether the agency's response time complies with an existing specified schedule and whether it is governed by an identifiable rationale."  <u>Ctr. for Sci. in the Pub. Int. v. FDA</u>, 74 F. Supp. 3d 295, 300 (D.D.C. 2014).  <u>Da Costa</u> effectively settled this matter when holding that the visa-availability approach "harmonizes the INA's priority principle with its per-country limits" and thus constitutes "a rule of reason as <u>TRAC</u> requires."  80 F.4th at 343.  That decision binds this Court and all but forecloses any challenge to the agency's processing rule.

While Plaintiffs accurately note that <u>Da Costa</u> did not involve the exact "same version of the visa availability approach" because USCIS subsequently retooled its ordering rule with two amendments, <u>see</u> Resp. Suppl. Auth. at 2–3, those new additions do not change the calculus. First, in the run up to <u>Da Costa</u>, USCIS announced it will now divide the queue of petitioners for whom a visa is available based on whether the agency previously has reviewed the underlying project.  <u>See</u> Mot. Dismiss at 21.  As the agency explained, and as courts in this District have

reiterated, this new tactic "makes sense based on USCIS's priorities" because it streamlines the review process for projects, like the Tryon Center, that have already been put through the paces. Mukkavilli, 2023 WL 4029344, at *13.  In a further effort to distinguish Da Costa, Plaintiffs point to the most recent processing change under which USCIS will now group "petitions from previously reviewed projects that were filed on or before November 30, 2019" and review those petitions together based on the earliest filing date.  Resp. Suppl. Auth. at 3.  USCIS explained in a press release that the "purpose of [this update was] to enable USCIS to increase productivity and more efficiently process Form I-526 petitions . . . because adjudicators can process Form I-526 petitions more efficiently when they are working [on] multiple petitions associated with the same [project] given the overlap in project documents and issues presented."  USCIS, Update to Visa Availability Approach for Form I-526, supra.  Plaintiffs dismiss this supposed efficiency gain as illusory because, if a project has been approved, there is no need to reassess the project—all that is required is an individualized review of the investor.  See Opp'n at 18.  That may be so, but it is still reasonable to expect that adjudicators will move quicker through related petitions as they gain greater familiarity with the project.  Plaintiffs also object to the November 2019 cutoff date by contending that, if it is truly more efficient to review all petitions from the same project together, that would remain true regardless of when a petition was filed.  Id.  But that is beside the point.  USCIS explained that the cutoff date was based on a "large volume of petitions filed shortly before the EB-5 modernization rule had taken effect in November 2019" and that it sought to clear this backlog without allowing every new petition from an approved project to jump the line.  USCIS, Update to Visa Availability Approach for Form I-526, supra.  That is a sensible balance to strike.  Despite some changes at the margins, then, Da Costa's core holding continues to ring true:  USCIS's policy for processing I-526 petitions follows a rule of reason.

Perhaps recognizing this reality, Plaintiffs pivot to arguing that USCIS does not abide by its proffered rule of reason.  They offer two pieces of evidence that, in their eyes, indicate that the agency may not play by its own rules: (1) processing records from other Tryon Center investors; and (2) a chart depicting the processing times of all investors across various projects. See Opp'n at 18–21.  Neither creates a plausible inference that USCIS is violating its own rule of reason because both outcomes are easily explained within USCIS's official processing system.

As to the first strand of evidence, Plaintiffs contend that USCIS has processed Tryon Center investors in a haphazard fashion that does not reflect the supposed rule of reason.  They note that Mridhul Prakash, who submitted his petition in February 2019, remained stuck in USCIS purgatory even as 156 out of the 204 Tryon Center petitions filed *after* his had been approved.  Am. Compl. ¶¶ 104–07.  But, notwithstanding the fact that Mr. Prakash has now been processed, his earlier delay proves little given that he is from India.  India long ago hit its country cap and, as a result, until recently there were no visas available for any petitioner who filed his or her Form I-526 in 2019.  See Mukkavilli, 2023 WL 4029344, at *2 (excerpting Department of State's "Visa Bulletin for January 2023"); Am. Compl. ¶ 55 ("The Department of State publishes a Visa Bulletin each month, listing the cutoff date for each category of visa.  Currently, India, China, and Vietnam all have a cutoff date.").

That is not the case for Geraldine Ponce Villegas of Venezuela and Jeremy Thomas Wiedman of Canada who filed their petitions in late 2019 and have since watched as USCIS processed more than 50 Tryon Center petitions filed afterward.  Id. ¶¶ 108–09; Opp'n at 19.  Yet their experiences also do not demonstrate that USCIS deviates from its rule of reason because there is an obvious selection issue here.  Under Plaintiffs' own allegations, USCIS did *not* follow its ordinary rules when processing most Tryon Center petitions because it had expedited all such

petitions until 2021 or 2022. It thus comes as no surprise that USCIS processed these petitions out of order. Instead, the complaint that Tryon Center petitioners who filed later were processed earlier is little more than a repackaging of Plaintiffs' earlier grievance that the agency ended its blanket expedite before they had reaped the benefit. But this collateral attack on the expedites (and subsequent revocation) falls flat because there is no evidence that the prior expedites, which both sides acknowledge were permitted, somehow swallow the rule of reason. See Da Costa, 80 F.4th at 342 (rejecting the argument that expedites or other occasional departures from the rule of reason nullifies that rule).[3]

Beyond the Tryon Center, Plaintiffs also present evidence pulled from an industry blog allegedly depicting the filing date for all petitions that USCIS adjudicated between July 2021 and September 2022. Opp'n at 21; Am. Compl. ¶ 177. This chart is depicted below:

**Table 1. Number of I-526 approvals, by approval date and I-526 filing date**

| Date of I-526 Approval | I-526 filing date (calendar year) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | <2015 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Jul-21 | 1 | | 7 | 4 | 24 | 9 | | | |
| Aug-21 | | | 2 | 3 | 6 | 4 | | | |
| Sep-21 | | | | | 4 | 10 | | | |
| Oct-21 | | 3 | | 2 | 2 | 1 | | | |
| Nov-21 | | | | | | 5 | | | |
| Dec-21 | | 2 | 1 | | | | | | |
| Jan-22 | | | | 3 | 1 | 4 | | | |
| Feb-22 | | 2 | | | 2 | 5 | | | |
| Mar-22 | | 1 | 1 | 2 | 4 | 19 | 1 | 1 | |
| Apr-22 | 4 | 6 | 4 | 7 | 21 | 19 | | 2 | |
| May-22 | 1 | 6 | 11 | 6 | 51 | 20 | | 2 | |
| Jun-22 | 2 | 6 | 8 | 9 | 37 | 14 | 1 | | |
| Jul-22 | | 6 | 3 | 9 | 56 | 3 | 1 | 3 | |
| Aug-22 | 3 | 2 | 4 | 4 | 52 | 21 | | 4 | 3 |
| Sep-22 | | 11 | 4 | 11 | 31 | 20 | 2 | 5 | 3 |
| Oct-22 | | | | | | | | | |
| Nov-22 | | | | | | | | | |
| Dec-22 | | | | | | | | | |

*Source: Confidential leak of USCIS data. Chart by blog.lucidtext.com.*

---

[3] To be sure, USCIS's explanation that all expedites after the 2018 Equestrian Games were "in error" raises some concerns given that "[a]ll but 17 of the 353 petitions that have been adjudicated were adjudicated after" the Games concluded. Opp'n at 20. If the agency were truly so prone to errors, one might fairly question USCIS's systems for ensuring compliance with its rule of reason. But as Plaintiffs demonstrate in the FOIA materials appended to their Opposition, see Opp'n, Ex. 1, it is not the case here that USCIS simply misfiled hundreds of petitions after the expedite closed. Rather, it appears that the agency granted a blanket expedite and then may have been less than forthcoming when explaining its claw back. While the seeming lack of transparency is not ideal, it does not undermine the core fact that USCIS abides by a rule of reason when processing Form I-526 petitions.

Plaintiffs highlight that the agency is simultaneously processing petitions from 2020, 2021, and 2022 while petitions from before 2015 are still outstanding.  "If Defendants had, in fact, been following a rule of reason," they assert, "there should simply not be any pre-2015 I-526 petitions left."  Opp'n at 21.

Yet, once again, there are myriad ways to explain the chart consistent with the agency's processing rules.  First, whereas the chart depicts when petitions were adjudicated, the agency's processing rules apply to the assignment of cases to adjudicators.  As USCIS explained in its brief, "the timeline for reaching an adjudicative decision varies depending on the circumstances presented in that particular case."  See Reply at 8 n.3; see also C.F.R. § 103.2(b)(8) (discussing procedures for requesting additional evidence).  Second, under the visa-availability approach, the agency deprioritizes petitions from countries that have met their country-cap.  This has caused a significant backlog for some countries.  China, for instance, recently had a mid-2015 "cutoff" date, meaning USCIS only processed petitions filed before summer 2015.  Mukkavilli, 2023 WL 4029344, at *2.  There is thus nothing suspect about USCIS processing petitions from 2015 while also processing more recent ones—that is how the visa-availability approach works.  Third, USCIS paused processing of Regional Center Program petitions during the nine-month statutory lapse starting in June 2021, leading the agency to process more recent petitions while older Regional Center Program petitions laid dormant.  Da Costa, 80 F.4th at 342.  Fourth, as this case demonstrates, USCIS sometimes breaks from standard processing rules when granting expedites in special circumstances.  See USCIS, Requests to Expedite Applications or Petitions, supra.  These expedites may explain why some petitions from 2022 and 2023 received rapid adjudications.  Alternatively, these speedy adjudications could be the product of the Reform

Act's priority-processing provision, which indisputably requires the prioritization of rural petitions filed after the Reform Act took effect.[4]

That's all to say there is no need to resort to accusations that the agency is violating its purported rule of reason to explain the chart's results. These results are entirely consistent with the agency's rules. Under these circumstances, the Court finds that Plaintiffs' allegation that USCIS is not abiding by its official policy fails to clear the hurdle separating the "plausible" from the merely "conceivable." Twombly, 550 U.S. at 570.

Switching gears, Plaintiffs contend that even if the *order* in which USCIS processes I-526 petitions is rational, the *time* it takes to process the petitions is nonetheless unreasonable. The complaint alleges that the agency's processing rate has inexplicably plummeted in recent years, causing wait times to skyrocket. It claims that USCIS's processing rates have dwindled since 2018, when the agency processed 15,122 petitions. Am. Compl. ¶¶ 187. That number dropped to 4,673 in 2019, id. ¶ 188, and then to 3,421 the following year, id. ¶ 191. It fell even lower in 2021 to 3,048, id. ¶ 193, before hitting a nadir of 1,415 in 2022, id. ¶ 194. The result has been a surge in wait times. As the D.C. Circuit recognized in Da Costa, "[t]he median time a petition decided in FY 2019 had been pending was 19.0 months; FY 2020, 31.1 months; FY 2021, 32.5 months; FY 2022, 44.2 months. And, as of April 30, 2023, the median time a petition decided this year had been pending was 49.4 months." 80 F.4th at 337. This trend occurred even while EB-5 petitions allegedly fell "from a high of 14,373 in 2015, to 6,424 in 2018, 4,194 in 2019,

---

[4] The priority-processing provision also easily explains Plaintiffs' status update stating that "[o]n December 12, 2023, Defendants approved the I-526E petition of an investor in the [Tryon Center] who filed his petition on May 12, 2023," even though the "investor filed nearly two years later than the latest Plaintiff to file a petition, and nearly three-and-a-half years after the earliest remaining Plaintiff filed his petition." Status Update, ECF. No. 19, at 1. If it is true that the priority-processing provision applies exclusively to rural petitions filed after the Reform Act, this evidence shows only that USCIS is following the statutory mandate.

4,328 in 2020, 814 in FY 2021, and 829 in FY 2022." Am. Compl. ¶ 206.  In light of this data,

Plaintiffs invite the Court to follow the approach that it employed in <u>Liu v. Mayorkas</u>, No. 20-cv-

654 (CRC), 2021 WL 2115209 (D.D.C. May 25, 2021), and find that they have adequately

alleged that USCIS's processing rates (and the resulting wait times) are unreasonable even if its

order for processing petitions makes sense.

 The Court must decline the invitation.  For starters, <u>Liu</u> was based on a unique factual

pattern raising concerns that USCIS may be intentionally foot-dragging its petition processing as

part of an overarching effort to curb immigration.  <u>Id.</u> at *4.  The facts alleged here do not give

rise to a similar inference that USCIS is purposefully slow-walking I-526 petitions.  Even more

importantly, the facts alleged here were also advanced before the Circuit in <u>Da Costa</u>.  <u>See, e.g.</u>,

80 F.4th at 337 ("USCIS's processing of Form I-526 petitions has slowed considerably, even

following the 2020 adoption of the availability-screened queue."); <u>id.</u> at 342 ("The processing

time for EB-5 petitions is long, and has been increasing over time, as USCIS's public statistics

show.").  But while it acknowledged that the surging wait times were "undoubtedly maddening,"

the Circuit held that the amount of time that it took USCIS to process the plaintiffs' petitions was

not *per se* unreasonable.  <u>Id.</u> at 342.  Recognizing "courts' narrow role in reviewing agency

delays" as well as the headwinds facing USCIS—such as the "nine-month pause in statutory

authorization," "the serious practical challenges posed by a global pandemic," and a "shortage of

resources"—the Circuit resolved that it could not "say as a matter of law that the processing time

itself establishes that USCIS lacks a rule of reason."  <u>Id.</u>; <u>accord</u> <u>Desai v. USCIS</u>, No. 20-cv-

1005 (CKK), 2021 WL 1110737, at *6 n.9 (D.D.C. Mar. 22, 2021) (noting courts "have

generally found that immigration delays in excess of five, six, seven years are unreasonable,

while those between three to five years are often not unreasonable").  The same is true here.

Although the Court appreciates Plaintiffs' frustration, neither their two to four years of administrative limbo nor the agency's slowed processing speeds undermines the rule of reason.

The Court thus finds that <u>TRAC</u> factor one, which is commonly referred to as the "most important" factor, weighs in favor of the government.  <u>In re Core Commc'ns, Inc.</u>, 531 F.3d 849, 855 (D.C. Cir. 2008).

### 2.  *TRAC Factor Four*

The fourth factor considers "the effect of expediting delayed action on agency activities of a higher or competing priority."  <u>TRAC</u>, 750 F.2d at 80.  This factor also carries great weight, <u>see</u> <u>Milligan v. Pompeo</u>, 502 F. Supp. 3d 302, 319 (D.D.C. 2020), and it too favors USCIS.

<u>Da Costa</u> again guides the way.  There, the Circuit recognized that "[b]ecause USCIS prioritizes adjudication based on the date a petition was filed, a court order requiring USCIS to adjudicate the Plaintiffs' Form I-526 petitions would move them ahead of longer-pending petitions.  Indeed, litigation by other Form I-526 petitioners has caused some line jumping."  80 F.4th at 343.  Given this zero-sum dynamic, the Circuit commented that "[i]n the absence of plausible allegations that USCIS is not applying its rule of reason, moving Plaintiffs' petitions to the front of the line would disrupt competing agency priorities with no overall improvement in the USCIS backlog."  <u>Id.</u>  It therefore concluded that "Plaintiffs' failure to plausibly allege that USCIS operates without a rule of reason, together with the effect that their requested relief would have on the queue of petitioners waiting ahead of the Plaintiffs, weighs against judicial intervention to expedite adjudication of Plaintiffs' petitions."  <u>Id.</u> at 344.

So too here.  Because Plaintiffs did not plausibly allege that USCIS is deviating from its rule of reason, judicial intervention here would do little more than "'impose offsetting burdens on equally worthy' EB-5 visa petitioners who are 'equally wronged by the agency's delay.'"  <u>Id.</u>

(quoting In re Barr Laboratories, Inc., 930 F.2d 72, 73 (D.C. Cir. 1991)).  This weighty factor thus falls in favor of the government.

### 3.   Remaining TRAC Factors

The remaining TRAC factors do not tip the scales back in Plaintiffs' favor.  For TRAC factor two, Plaintiffs note that, when amending the INA, lawmakers expressed the "sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application."  Immigration Services and Infrastructure Improvements Act of 2000, Pub. L. No. 106-313, Title II, § 202, Oct. 17, 2000, 114 Stat. 1262, 1262 (codified at 8 U.S.C. § 1571(b)).  This intuition was not a binding directive, however.  Thus, even if the Court can look "to Congress's aspirational statement as a ruler against which the agency's progress must be measured," this factor only "somewhat favors Plaintiffs" where, as here, the "delay has not reached the level of disproportionality [courts] have previously held sufficient to grant relief."  Da Costa, 80 F.4th at 344.

Factors three and five also lend weak support to Plaintiffs.  For the third factor, courts assess whether "human health and welfare are at stake," and for the fifth, they evaluate the "nature and extent of the interests prejudiced by delay."  Schwartz v. U.S. Dep't of Homeland Sec., No. 21-cv-378 (JEB), 2021 WL 4133618, at *4 (D.D.C. Sept. 10, 2021) (quoting TRAC, 750 F.2d at 80).  Although the Court recognizes Plaintiffs' interest in reaping the value of their investments and receiving the visas they seek, Da Costa held that such harms do not distinguish Plaintiffs from other petitioners and are "insufficient to tip TRAC factors three and five in [their] favor."  80 F.4th at 345.  Plaintiffs' speculation that the prolonged delay leaves them at risk that USCIS might adopt unfavorable policies in the future and apply them retroactively against their petitions also does not move the needle.  See Opp'n at 23.

The sixth and final <u>TRAC</u> factor directs courts to consider whether there is "any impropriety lurking behind agency lassitude," although it need not find any "in order to hold that agency action is 'unreasonably delayed.'" <u>TRAC</u>, 750 F.2d at 80 (citation omitted).  Here, Plaintiffs renew their argument from <u>TRAC</u> factor one when contending that the agency has exhibited bad faith by intentionally slow-walking adjudications.  <u>See</u> Opp'n at 25.  But for the same reasons that argument failed above, it is insufficient to plausibly allege impropriety.  <u>See</u> <u>Da Costa</u>, 80 F.4th at 346 (D.D.C. 2022) ("The allegation about fraudulently inflated processing times is conclusory and implausible.").  And while Plaintiffs do not reup their claim that the decision to revoke the expedite was somehow tainted by a competitor's improper influence, <u>see</u> Am. Compl. ¶ 89, that allegation is speculative and any impropriety in the revocation decision would not call into question the reasonableness of the delay given that the current wait times are driven by factors that have little to do with the Tryon Center.  This factor is therefore neutral.

*       *       *

In sum, under the <u>TRAC</u> factors, Plaintiffs do not state a claim of unreasonable delay. The visa-availability approach is a rule of reason, and the complaint does not plausibly allege that USCIS has deviated from its official policy.  Given that the agency follows a rule of reason, granting Plaintiffs relief would simply push their petitions ahead of others, many of which have languished just as long.  Although Plaintiffs have waited a long time to have their petitions processed—far longer than Congress envisioned—their wait times are not *per se* unreasonable, the burdens they have endured are not unusual, and they point to no government impropriety. The Court will, accordingly, grant the motion to dismiss on the unreasonable-delay claim and await a further motion to dismiss, to be filed within 60 days, addressing the outstanding priority-processing issue.

**IV.   Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 9] Defendants' Motion to Dismiss is GRANTED in part and
DENIED in part; it is further

**ORDERED** that Defendants shall file a renewed motion to dismiss the remaining claim
within 60 days of this Order.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: February 12, 2024